[No. 25197. Department One. April 17, 1935.]

CHESTER RANDAHL PAULSON *et al., Respondents,* v. MONTANA LIFE INSURANCE COMPANY, *Appellant.*[1]

[1]Reported in 43 P. (2d) 971.

*Graves, Kizer & Graves,* for appellant.

*G. E. Lovell,* for respondents.

GERAGHTY, J.—In this action the plaintiffs sued for recovery under the provisions of the disability clause of a life insurance policy issued by the defendant upon the life of the plaintiff Chester Randahl Paulson, who will hereinafter be referred to as if the sole plaintiff and respondent.

The policy sued on was issued by the defendant February 15, 1927. It insured the life of plaintiff for twenty thousand dollars and included special provisions for the payment of double indemnity in the event of death resulting from accidental means, and for a total disability benefit of two hundred dollars per month. By its terms, the policy was to become incontestable after it had been in force two years, except as to the provisions relating to benefits for total disability and granting additional insurance against death by accident. The policy had attached to it photostatic copies of plaintiff's application for the policy, as well as answers made to the medical examiners of the defendant.

In answer to the medical examiner's question, "Name below all causes for which you have consulted a physician, osteopath, chiropractor or any practitioner in the last ten years," the plaintiff answered "None." To the question, "Are you now in good health?" the answer was "Yes." To the question, "Has any examiner or physician, formally or informally, expressed any unfavorable opinion as to your insurability or health?" the answer was "No." To the question, "Have you ever been under observation or care in a hospital, sanitarium, asylum or institu-

tion?'' the answer was, "No." To the question, "Have you now, or have you ever had, fits or nervousness, rheumatism, asthma, pleurisy, spitting of blood, gallstones, ear abscess, any disease of heart, lungs, stomach or kidneys, or any other disease or injury?" the answer was, "No."

Subjoined to the medical examination is the following declaration subscribed by the plaintiff:

"I hereby declare that all statements and answers as written or printed herein and in Part I of this application are full, complete and true, whether written by my own hand or not, and I agree that they are to be considered the basis of my insurance issued hereon.

"I hereby waive, both for myself and for all persons who may hereafter claim any interest in the Policy herein applied for, all my rights under and any and all statutes that prohibit or restrict any physician who has attended me or prescribed for me, or who may in the future attend me or prescribe for me, from testifying in any court regarding my health, habits, or any communications I may have made to him regarding the same, and I agree that such physician or physicians may testify as to all such matters as fully as if no legal prohibition or restriction on such testimony had ever existed.''

In December, 1932, plaintiff reported to defendant that he was in ill health and entitled to payment of the benefits provided in the total disability clause of his policy. Upon receiving this report, the defendant made an investigation of the plaintiff's claim and the conditions under which the policy was issued. This investigation led to the discovery that the answers made by plaintiff in his medical examination were untrue, and that, at the time the policy was written, he was suffering from diabetes and was not an insurable risk. By this time, the straight life policy had become incontestable.

The defendant entered into negotiations seeking to

have the plaintiff surrender the policy in order that it might be reissued to him without the provisions for double indemnity and total disability, which the defendant claimed to be unenforcible on account of plaintiff's misstatements of fact in his medical examination. While these negotiations were pending, the plaintiff commenced this action.

Upon trial to a jury, the plaintiff made his case in chief by offering in evidence the policy, receipts for the payment of premiums, and by evidence tending to show total disability within the terms of the policy. Called as a witness by the defendant, plaintiff testified that, at the time the policy was written, he was residing in Tacoma and had his office in a suite of rooms used in common with a Mr. Green, the local agent of the defendant. While he spoke to Mr. Green about the condition of his health, he did not mention life insurance.

J. H. McCullough was the general agent of the defendant for western Washington, with his office in Seattle. He made frequent visits to Tacoma and during these visits called upon the Tacoma agent, Mr. Green, at his office, and there became acquainted with the plaintiff. Plaintiff testified:

"Mr. McCullough, the Seattle man, was over there a great deal. He was Green's superior I guess, and at various times that he was there I met him and he approached me on taking out some life insurance. In these offices it was general knowledge that I had diabetes. . . . When Mr. McCullough approached me on taking out some life insurance, I said no. I said, 'You know I have diabetes. I can't get life insurance. At least, that is my understanding.' . . . And he said, 'Our company will write you.' And we talked a little bit and I passed it off. I wasn't in the mood to take on any life insurance, didn't think I could get it anyway, but McCullough was over there every few days and he kept coming to me trying to sell me the

idea of taking out some life insurance, and finally more or less talked me into the fact that he would be able to get me a policy. . . . He said 'If you will come to Seattle and be passed by our doctor in Seattle, I will get you the policy.' "

Plaintiff testified that he acquired his understanding that he could not get life insurance "just from general knowledge of what I had heard, picked up in the way of conversation with life insurance men, that a party having diabetes, the insurance company wouldn't write him." It may be said, in passing, that respondent had quite definite information that diabetics were not insurable, because it appears from his testimony that, some three years before the issuance of the policy here involved, another insurance policy carried by him lapsed for nonpayment of premium, and that he called upon his physician, Dr. Epplen, to be examined with the view of applying for a reinstatement of the policy, and was told by the doctor that it would be useless for him to attempt reinstatement because of his diabetic condition.

Plaintiff went to Seattle and called on McCullough at his office there. McCullough called Dr. Loer, one of the defendant's medical examiners, to his office for an examination of the plaintiff. The doctor asked plaintiff the several questions set out in the medical examination form. These questions were answered, not by the plaintiff, but by McCullough, who remained in the room during the examination. During the questioning, the plaintiff remained silent. At the conclusion of the questioning, he signed the statement certifying to the truthfulness of the answers and also another blank form, a counterpart of the one that had been filled out by Dr. Loer. According to his testimony, his only comment on the incorrect answers given by McCullough in his presence and hearing was that, after

the examination and after Dr. Loer had left, he said to McCullough:

"On the question of the hospitals, I have been in hospitals and you said I hadn't. You had the doctor put down there 'no'. I says, 'I have been in hospitals.' McCullough says, 'Oh, that doesn't make any difference. That is three years ago.' "

Separate examinations by two physicians were required. The plaintiff testified that he was not examined by the second physician, Dr. Nelson, a photostatic copy of whose examination is attached to the policy; the inference from plaintiff's testimony is that Dr. Nelson must have copied upon the blank form signed by plaintiff the answers written by Dr. Loer on the first form.

Doctors Loer and Nelson testified they personally made the examination as certified by them, and that the answers were given by the plaintiff and that McCullough was not present. McCullough contradicted the testimony of the plaintiff as to the details of the examination. The plaintiff also testified that, when examined by Dr. Loer, he left a specimen of his urine, and that later McCullough told him the urine was found to contain sugar, and gave him a container for another specimen to be taken by McCullough to Seattle for examination by Dr. Loer.

Dr. George H. Anderson, plaintiff's physician in Spokane from 1924 to the time of the trial, called by defendant, testified from his records that he was first consulted by plaintiff in May, 1924. At that time, he was associated with Dr. Frederick Epplen. His diagnosis, as recorded at that time, showed that the plaintiff was suffering from diabetes mellitus. From the office record, it appears that plaintiff at that time entered Sacred Heart Hospital in Spokane. The record does not indicate the length of his stay in the hospital,

but it was of short duration. His entry into Deaconess Hospital in Spokane is shown on December 7, 1925. The office record states:

"Diabetes began two years ago. Present symptoms started two months ago. Also two years ago he had his first attack which was similar to present. He was treated and told to diet. Since then he has had several attacks. He has not followed any diet strictly."

The record leaves no room to doubt that, for several years preceding his application for the insurance policy, the plaintiff had suffered from diabetes, which he was attempting to control by the regular use of insulin.

At the conclusion of all the testimony in the case, the defendant challenged the sufficiency of the evidence to sustain a recovery and moved for dismissal. The motion was denied and the case submitted to the jury, who returned a verdict in favor of plaintiff. Defendant's motion for judgment notwithstanding the verdict was denied, and judgment entered upon the verdict. The defendant appeals.

The appellant assigns as error the court's denial of its challenge to the sufficiency of the evidence and its motion for judgment notwithstanding the verdict. Other errors are assigned, but as our conclusion on the first two assignments will dispose of the case, it is unnecessary to refer to them.

In a memorandum opinion passing upon the motion for judgment notwithstanding the verdict, the trial court, in summarizing the evidence, used the following language:

"The record shows without dispute that the answers made by McCullough to the questions put by Dr. Loer, which have been quoted, were all false, and that Paulson and McCullough both knew them to be false. Paulson, however, remained mute during the asking of the

questions by the physician and the making of the false answers by McCullough.

"The entire record conveys the distinct impression that there was a collusive arrangement between Paulson and McCullough, the district agent of the defendant company, and that the intent and purpose of Mr. Paulson in sitting mute while the false answers were being made by McCullough to the interrogations of the physician were to deceive and defraud the company."

Nothwithstanding this view, the trial court felt constrained, by certain decisions of this court as he understood them, to submit the case to the jury upon the issue of respondent's fraudulent intent.

■ The trial court did not over-state the conclusion to be drawn from the record. There is no room to doubt the intention of the respondent to deceive the appellant. He knew insurance companies would not issue policies to diabetics. He remained silent when McCullough gave untruthful answers to the medical examiner. He must have known that, if the appellant knew his physical condition, it would not write the policy; and he must have known that McCullough was violating his trust in making the false answers. Two of our recent decisions are decisively against respondent on this branch of the case: *Perry v. Continental Ins. Co.,* 178 Wash. 24, 33 P. (2d) 661, and *McCann v. Reeder,* 178 Wash. 126, 34 P. (2d) 461. In both of these cases, upon the facts, we held that there was fraudulent intent as a matter of law. The facts in the present case are much stronger against respondent's contention. In the *McCann* case, discussing the provisions of Rem. Rev. Stat., § 7078 [P. C. § 2941], we said:

"Under our decisions construing this statute, the beneficiary's right to recover upon the policy is not defeated or avoided merely because the representations are false. It must also be found that they were made with intent to deceive. *Houston v. New York Life Ins.*

*Co.*, 159 Wash. 162, 292 Pac. 445, and cases therein cited. The effect of the rule as prescribed by the statute is that the intent of the one making the misrepresentation or warranty is ordinarily a question of fact. If there be a conflict in the evidence touching that question, it is to be resolved by the trier of the fact; if, however, there be no conflict in the evidence, or if, from the evidence, only one conclusion can properly be reached, it must be determined as a matter of law.''

In the *Perry* case, we quoted with approval the following from *Day v. St. Paul Fire & Marine Ins. Co.*, 111 Wash. 49, 189 Pac. 95:

''We have gone far in maintaining, as a question of fact, the intent accompanying false and fraudulent representations, and have allowed to be submitted to the jury for its determination the question of intent where there has been very slight proof that the applicant for insurance might have had no idea of procuring the policy by misrepresentations, but the rule should not be so far extended as to include a case such as this and allow insurance to be enforced which was not procurable had the truth been told, where it was issued relying upon fraudulent statements and the proof of honest intent consists merely in the applicant's bare affirmation that his intent was honest. The proof of the making of false and fraudulent representations raises a presumption of dishonest motive, which must be overcome by evidence establishing an honest motive.''

Indeed, a serious discussion of this question is hardly necessary, in the light of the admissions of respondent's counsel in the course of the trial. When appellant's counsel introduced testimony of a medical examiner of a life insurance company that such companies would not write insurance on diabetics, respondent's counsel objected, saying:

''We claim that diabetes is a bad disease; we claim that possibly the company would not have written it. That is not our defense. Our defense is, that this

agent would have written it whether the company wrote it or not.''

And again:

''We understand that insurance companies don't [write such insurance], and we understand agents will. That is the proposition.''

We cannot escape the conclusion that the record established, as a matter of law, the respondent's intent to deceive the appellant.

But respondent contends that the appellant, through its agent McCullough, knew of the fraud perpetrated upon it, although McCullough was a party to the fraud, under the well recognized rule that the knowledge of the agent is the knowledge of the principal. The respondent cites *Turner v. American Casualty Co.*, 69 Wash. 154, 124 Pac. 486, and *Eaton v. National Casualty Co.*, 122 Wash. 477, 210 Pac. 779, and some other cases of like import in support of his contention. It is true that these cases have gone a long way in holding insurance companies responsible for the acts of their agents, and in imputing to them knowledge of the facts known to their agents. In the *Turner* case we said:

''The underlying principle of these cases is that the knowledge of the agent is the knowledge of the principal, without regard to whether the agent communicates the facts to it; that where the insured makes full and truthful statements to the agent who procures the policy of insurance, the insurer will be held to have waived the written warranties in so far as they are not in harmony with the facts disclosed.''

And in the *Eaton* case, we said:

''It is probably true, as appellant contends, that the facts to be elucidated in the questions propounded to the insured in the application were material and pertinent to the risk by reason of the occupation in which respondent was engaged; but it is also true, as ap-

pellant concedes, and as was held in *Turner v. American Casualty Co.,* 69 Wash. 154, 124 Pac. 486, that a policy will not be held void nor the warranty clause in a policy held to have been breached for acts known to the agent before the application for the policy was signed, where the insured fully and truthfully related the facts to the solicitor and false answers were written in the application by the agent.''

These cases mark the utmost limit to which we have gone, but it will be at once apparent that the principle announced in these cases falls far short of holding that, where the insured and the agent collude together to defraud the principal, the principal is nevertheless bound. Fraud vitiates every contract into which it enters, and the rule of law which imputes to the principal the knowledge possessed by the agent does not apply where a fraud has been committed by collusion of the agent with the insured.

''The law imputes to the principal, and charges him with, all notice or knowledge relating to the subject-matter of the agency which the agent acquires or obtains while acting as such agent and within the scope of his authority, or, according to the weight of authority, which he may previously have acquired, and which he then had in mind, or which he had acquired so recently as to reasonably warrant the assumption that he still retained it. Provided, however, that such notice or knowledge will not be imputed: . . . (3) Where the person claiming the benefit of the notice, or those whom he represents, colluded with the agent to cheat or defraud the principal.'' 2 Mechem on Agency, (2d Ed.) § 1813.

''The rule which imputes to the principal the knowledge of his agent is, as has been seen, commonly based upon the legal presumption that the agent has done his duty by communicating it to his principal,—a presumption which, it is said, is demanded by a sound public policy for the protection of those who deal with the agent. Obviously no policy requires that such a presumption shall be made for the protection of a

person who has conspired with the agent to defraud the principal and who now seeks the benefit of a presumption that a duty has been performed which he himself was interested in having violated." 2 Mechem on Agency, (2d Ed.) § 1826.

"It has been well said that there are certain general and fundamental maxims of the common law which control laws as well as contracts. Among these are: 'No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are adopted by public policy, and have their foundation in universal law administered in all civilized countries.' These maxims embodied in the common law, and constituting an essential part of its warp and woof, are found announced both in textbooks and in reported cases. Without their recognition and enforcement by the courts, their judgments would excite the indignation of all right-thinking people." *Box v. Lanier,* 112 Tenn. 393, 79 S. W. 1042, 64 L. R. A. 458.

The rule is authoritatively stated in *Mutual Life Ins. Co. v. Hilton-Green,* 241 U. S. 613, 36 S. Ct. 676:

"The general rule which imputes an agent's knowledge to the principal is well established. The underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest. But this general rule does not apply when the third party knows there is no foundation for the ordinary presumption—when he is acquainted with circumstances plainly indicating that the agent will not advise his principal. The rule is intended to protect those who exercise good faith and not as a shield for unfair dealing."

The rule here applicable is nowhere better expressed than in the first paragraph of our own insurance code, being Rem. Rev. Stat., § 7032 [P. C. § 2908]:

"Within the intent of this act the business of apportioning and distributing losses arising from speci-

fied causes among all those who apply and are accepted to receive the benefits of such service, is public in character and requires that all those having to do with it shall at all times be actuated by good faith in everything pertaining thereto; shall abstain from deceptive or misleading practices, and shall keep, observe, and practice the principles of law and equity in all matters pertaining to such business. Upon the insurer, the insured, and their representatives shall rest the burden of maintaining proper practices in said business.''

This section is binding upon both parties to the contract of insurance.

■■■ In the trial below, evidence was introduced by respondent tending to prove that, after acquiring knowledge of the falsity of the answers in the application, appellant accepted a premium from respondent on the policy, and respondent urged that, by doing so, the appellant had waived its right to question the policy by reason of untruthful statements. The trial court, at the close of the case and over respondent's objection, withdrew the issue of waiver from the consideration of the jury. The respondent has taken a cross-appeal from this decision of the court. The appellant questions respondent's right to raise the correctness of the court's ruling in this manner. We do not feel it necessary to pass upon the question of procedure, because, as the trial court correctly found, there was not sufficient evidence of waiver or estoppel to submit the question to the jury.

After the discovery of the deception that had been practiced upon it, the appellant made timely effort to procure a cancellation of the disability and double insurance features of the policy. As we have seen, the life policy itself had become incontestable. There was only the one policy. The policy was written as an entirety, having as incidental features to the straight

life insurance the disability and double insurance benefits. The appellant sought, through negotiations with respondent, to have him surrender the policy for reissue without these collateral features. The policy could be corrected only in this manner or by a suit for reformation. The premium on the policy as a whole was in a lump sum, although the amount to be deducted from the premium, should the respondent elect to discontinue the disability and double insurance features, was fixed. While the respondent had an option to discontinue these benefits, the appellant could not itself do so. While the negotiations for the surrender and reissue of the policy were pending, the suit was commenced.

There was nothing in the conduct of the appellant to warrant the conclusion that it intended a waiver of its rights. There was no estoppel, because the situation of the respondent remained unchanged. In the course of the negotiations, the appellant attempted to return the portion of the premium chargeable to the disability and double insurance features, and made a tender to the attorney who represented the respondent and also the Spokane Security Finance Corporation, to whom appellant learned the policy had been assigned. Later, the appellant deposited in court all of the premiums theretofore collected from the respondent on account of the double insurance and disability features.

In its cross-complaint, the appellant sought a decree declaring the double insurance and disability features of the policy null and void because of misrepresentations and fraud, and requiring the respondent to surrender the policy for the purpose of having those features eliminated and a new policy issued in lieu thereof, in all respects in conformity with the original contract except as to the questioned features.

Before trial, the appellant moved to strike the case from the jury calendar and that it be tried as one in equity. This motion was denied.

Having reached the conclusion that the double insurance and disability provisions of the policy are void, we think the appellant is entitled to a judgment so declaring, and requiring the surrender of the policy and its reissue as prayed for in the cross-complaint. As we have heretofore said, the outstanding policy was issued as an entirety. The record shows that it was once assigned to the Spokane Security Finance Corporation, which was made a party in this case. If left uncancelled, the policy would still be subject to assignment to innocent parties. To prevent this and to avoid the necessity of another suit for its reformation, the whole controversy should be settled.

Accordingly, the judgment of the trial court is reversed, and the cause remanded with direction for the entry of judgment in accordance with this opinion.

TOLMAN, MAIN, and BEALS, JJ., concur.

MILLARD, C. J. (dissenting)—I dissent. Having accepted payment of premium with full knowledge of the fraud, the appellant is estopped.