[No. 26149.   Department One.   August 20, 1936.]

GREAT NORTHERN LIFE INSURANCE COMPANY, *Respondent,* v. JUNE JOHNSON *et al., Appellants.*[1]

[1]Reported in 60 P. (2d) 109.

C. C. *Quackenbush* and A. O. *Colburn,* for appellants.
*Reba J. Hurn,* for respondent.

GERAGHTY, J.—This appeal is from a decree cancel-ing a policy of life insurance.

The Great Northern Life Insurance Company is-sued a life policy in the sum of one thousand dollars to Mrs. Emma M. Johnson, on February 12, 1934, in which her daughter, June Johnson, of full age at the time of the commencement of the suit, and a son, Daniel Johnson, a minor twelve years of age, were named as beneficiaries. The policy was incontestable after two years from its date of issue. By its terms, the policy, with the application, a photostatic copy of which was attached, was to constitute the entire con-tract between the parties.

The application, signed by the insured, consisted of parts I and II, part I being answers to general ques-tions not material here. Part II, captioned "Declara-tion of Insurability In Lieu of Medical Examination," contained questions and answers having relation to her medical history and condition of health. The fol-lowing are the questions and answers having relation to the issues involved in the case:

"(19)  (a)  What is your exact weight?
                  (use scale)                165 Lbs.
          (b)  What is your exact height?
                  (use measure)             5 Ft. 8 In.
"(20)  Has your weight increased or diminished
          within the last two years?        Same

"(21) Have you ever had any of the following:
  (Answer as to each)

  B. Disorder of Heart or Blood Vessels:
     (Such as palpitation, valvular dis-
     ease, endocarditis, fainting spells,
     piles, etc.)                          No

  F. General Disease:
     (Such as rheumatism, syphillis, dia-
     betes, enlarged glands, goitre, cancer,
     growths, or tumors, etc.)             No

"(22) Have you within the last seven years
  consulted any physician not previously
  mentioned?                               No."

The application recited:

"That all statements, representations, and answers, including those made in Part 2 of this application and any hereafter made to any medical examiner as a part of this application, are a consideration for and a basis of any contract for insurance in the Great Northern Life Insurance Company, issued pursuant hereto; and whether written by my hand or not, are true, full, and complete. . . ." [Part I]

"I declare on behalf of myself and any person or persons, firm or corporation, who may have or claim any interest in any policy issued hereunder, that each of the above answers is full, complete, and true, and that to the best of my knowledge and belief the person upon whose life insurance is applied for is in good health and a proper subject for life insurance." [Part II]

There was an express waiver of all provisions of law disabling any physician consulted by the insured from disclosing any knowledge or information thereby acquired.

At the time the policy was written, the insured lived in Spokane. In the early part of 1935, she removed to California and died there May 19, 1935.

In its complaint seeking the cancellation of the policy, the insurance company alleged that, after the submission of due proofs of death, it caused an investigation to be made and, through this investigation, learned that the answers, quoted above from the application, made by the insured, were not true, and that it elected to rescind the policy because of the failure of the insured to disclose material facts relative to her physical condition and insurability, prior to the issue of the policy. A deposit of the amount of premiums paid by the insured was made with the clerk of the court. The plaintiff's action was begun September 27, 1935, within the two-year period during which the policy, by its terms, was made contestable.

After the dissolution of a temporary restraining order obtained by the plaintiff, the defendants answered, seeking affirmative relief by a judgment for the face of the policy with interest and costs. They demanded a jury trial and deposited the fee therefor.

When the cause came on for trial, the court, while holding it to be one of equitable cognizance, impaneled an advisory jury. Upon the return of a verdict favorable to the defendants, the court chose to disregard it as being only advisory, and entered a decree canceling the policy. The defendants appeal.

The first error assigned by the appellants is the refusal of the court to accept as binding the verdict of the jury and treating the cause as one of equitable cognizance.

The appellants urge that our decision in *Northern Life Ins. Co. v. Walker*, 123 Wash. 203, 212 Pac. 277, is controlling on the question of their right to a jury trial. Assuming, without deciding, that this is true, nevertheless, we are of the opinion that the judgment must be affirmed, for the reason that some of the material warranties contained in the application were

untrue and made with knowledge of their falsity, and with the intent to deceive. This being so, it would have been the duty of the court in any event to withdraw the case from the consideration of the jury and enter a decree rescinding the policy.

Dr. T. M. Ahlquist, a physician and surgeon of Spokane, whose qualification was conceded and of whom the insured had been a patient, was called as a witness by the respondent under the waiver of privilege made by the insured in her application, and testified as to the medical history of the insured as she disclosed it to him [quoting from the abstract]:

"She had had the usual diseases of childhood—measles, chickenpox, mumps. She had had two normal deliveries. She had had influenza when 28 years old and for the past four years previous to the date I saw her, August 22, 1933, had been under treatment for a goiter, and she had her appendix removed when 29 years old. That was the history that she gave me.

"Her then complaint was a nervousness, a tired feeling; more nervous than normal; attacks of palpitation of the heart, shortness of breath, constipated, some stomach discomfort, slept poorly and dizziness.

. . .

"She had one infected tonsil or piece of tonsil, and I removed that on August 25, 1933. The right tonsil was removed under local anesthetic in the office.

"It was possibly causing some infection to her thyroid gland or—yes, thyroid gland. I was going to say goiter but that wouldn't be the right way to put it—an infection of the thyroid gland which when matured is considered as a goiter by the layman.

"When I saw her on August 22, 1933, she had an exophthalmos, more marked on the right side than the left. By exophthalmos I mean a bulging of the eyes in goiter cases known as exophthalmic goiters, and she had some exophthalmos present. She also had a definite tremor of the hands, which is characteristic of thyroid cases. It is just a fine tremor. That was present. She didn't have the rapid pulse at that

time. Usually in those exophthalmic cases she would have. She didn't have the rapid pulse at that time, but she had an exophthalmos and tremor and minus metabolic rating. Those were the present evidences.

"She was given medicine and her weight dropped to 190 by March 14th, 1934."

Letters from Mrs. Johnson in California to Dr. Ahlquist were admitted as plaintiff's exhibit 5. They asked for more medicine and told of further reduction in weight.

"My final diagnosis was that she had a hypo thyroidism. She also had a low grade of chronic kidney trouble, which wasn't of really serious consequences. It was a low specific gravity, but the condition for which I treated her was a hypo thyroidism or an insufficiently active thyroid gland."

On cross-examination, Dr. Ahlquist said the insured was very frank in giving her family history and didn't try to cover up anything as far as he could tell.

At the time she first called on him, her weight was 201¼ pounds. This was gradually reduced, by treatment taken under his direction, until it stood at 190 pounds in March, 1934, when she last called at his office. The medicine he gave her to strengthen her thyroid activity would reduce her weight as part of the treatment, and as her weight decreased, he looked upon that as favorable progress. He found her height to be five feet six inches, without shoes on.

The insured was a large woman and accustomed to hard work. Her husband had died some time before the policy was written, and thereafter she was employed to do housework in her brother's home and in other homes, work which apparently was well done.

Asked as to the removal of the piece of infected tonsil and whether it was serious, Dr. Ahlquist answered that it was not. It was removed as a factor

in eliminating one cause of the patient's hypothyroidism. Testifying further, he said:

"Q. And you say that she didn't have a rapid pulse that you often find in serious goiter cases? A. Not a constantly rapid pulse. Her pulse varied from 72, which is quite normal, up to 92, which is not a— Q. Nothing alarming about that, is there? A. No. Of course, to make it clear, we have two kinds of goiters. In the toxic goiter the pulse runs much more rapid than it does in the hypothyroidism, although in the active exophthalmos case the pulse runs much higher, and she had an exophthalmos. Q. The toxic goiter is the more serious type? A. The symptoms are much more severe. As a rule the symptoms of the patient are more severe. Q. And more likely to cause death? Isn't that true, Doctor, a toxic goiter? A. No, I wouldn't say that. I think the mortality is pretty much the same in both the exophthalmic and toxic thyroids. Q. And that she had been taking some tablets or something for goiter treatment over a period of three or four years? A. She didn't say tablets. She said she had been under treatment for goiter for the past four years. Q. You described this thyroid condition as an inactive thyroid condition, Doctor? A. Well, that is not the way to put it really. It is a hypo. It is not functioning up to normal, which keeps the pulse frequently slow and the body physiology or the body metabolism low. That is the reason we have a minus metabolism, because the thyroid is not functioning enough to keep the body physiology up to normal. The word 'inactive' would not be proper but it would be more proper to say it wasn't functioning up to normal."

Dr. Arthur E. Lien, called by the appellants as an expert, testified that hypothyroidism may be, if far advanced, a very disabling and distressing disease, but that, of itself, it does not cause death. Answering a hypothetical question, he said there was no connection between pulmonary embolism, the immediate cause of the insured's death, and hypothyroidism.

Asked about palpitation of the heart, he said it might be due, and commonly had relation, to overweight, not necessarily because of overweight, but because of conditions that caused the patient to be overweight. Persons suffering from hypothyroidism are usually overweight. It is a condition not to be ignored and requires treatment. Mild cases may get along without seeing a physician, but if a physician is consulted and proper treatment given, the patient gets along better. It is not a mild disease like a cold that can be gotten over in a few days. Would be classed as rather a serious disease if not cared for. It is a serious disease in the discomfort and disability that it may give to the patient. He would regard an exophthalmic goiter as a serious disease.

Referring to the degree of metabolism which Dr. Ahlquist testified he found, Dr. Lien said that such a patient could have hypothyroidism, a moderate case but quite definitely above normal.

The insurance agent who took the insured's application, called as a witness by the appellant, testified that upon meeting the insured, she looked healthy to him. She told him that she had had minor ailments, or, in his own words:

"Q. Do you recall, Mr. Morse, Mrs. Johnson telling you there that evening that she had been to some doctor's for some minor ailments. A. We always ask that question and we don't believe, in life insurance, in taking applications (at least I don't) that small illnesses, such as colds or stuff like that are really what the insurance company asks when they ask the question about 'have you been to a doctor for any illnesses that have come up?' Right after that particular question she said, 'Yes, I have had minor illnesses, colds and stuff like that, where I have gone to the doctor,' but she said, 'they didn't amount to anything,' and I said, 'That is all I wanted to know.' I wanted to know if there was anything special or any-

thing in her physical make-up that would be serious. That was the question I was asking.''

Whether the insured had a true goiter, or only a goiter condition, there can be no doubt that the seriousness of her state of health was such as to call for a frank disclosure in her application for insurance. At the time of her application, she had been under the care of Dr. Ahlquist for six months and, prior to that time, according to the information she gave him, had been taking treatment for what she described as goiter for four years. She was not ignorant of her condition, and her negative answers to the questions asked warrant no other interpretation than a purpose to deceive.

The appellants rely upon Rem. Rev. Stat., § 7078 [P. C. § 2941], reading:

''No oral or written misrepresentation or warranty made in the negotiation of a contract or policy of insurance, by the assured or in his behalf, shall be deemed material or defeat or avoid the policy or prevent it attaching, unless such misrepresentation or warranty is made with the intent to deceive. If any breach of a warranty or condition in any contract or policy of insurance shall occur prior to a loss under such policy, such breach shall not avoid the policy nor avail the insurer to avoid liability, unless such breach shall exist at the time of such loss under such contract or policy.''

It is true that we have held in decisions rendered since the enactment of this section that it is not enough to find that the representations were false; that it must be found further that they were made with intent to deceive. *Houston v. New York Life Ins. Co.*, 159 Wash. 162, 292 Pac. 445, and cases there cited; also, *Kearney v. Washington National Ins. Co.*, 184 Wash. 579, 52 P. (2d) 903.

But, as was said in *Day v. St. Paul Fire & Marine*

*Ins. Co.,* 111 Wash. 49, 189 Pac. 95, the rule should not be so far extended as to include a case where insurance would not be procurable if the truth were told.

"The proof of the making of false and fraudulent representations raises a presumption of dishonest motive, which must be overcome by evidence establishing an honest motive."

*Mutual Life Ins. Co. v. Campbell,* 170 Wash. 485, 16 P. (2d) 836; *Perry v. Continental Ins. Co.,* 178 Wash. 24, 33 P. (2d) 661.

As was said in *Paulson v. Montana Life Ins. Co.,* 181 Wash. 526, 43 P. (2d) 971, the applicable rule finds legislative expression in Rem. Rev. Stat., § 7032 [P. C. § 2908], where it is declared to be the intent of the insurance code that the business of apportioning and distributing losses arising from specified causes among all who apply to receive the benefits of its services is public in character and requires that those having to do with it, shall be actuated by good faith and

". . . abstain from deceptive or misleading practices, and shall keep, observe, and practice the principles of law and equity in all matters pertaining to such business. Upon the insurer, the insured, and their representatives shall rest the burden of maintaining proper practices in said business."

The decree is affirmed.

MILLARD, C. J., MITCHELL, TOLMAN, and STEINERT, JJ., concur.