## EQUITABLE LIFE INS. CO. OF IOWA v. CARVER et al.
### No. 32.

District Court, W. D. Washington, N. D.
Oct. 24, 1936.

Kahin & Carmody and Orlo B. Kellogg, all of Seattle, Wash., for plaintiff.

Chas. A. Sather and Geo. Livesey, both of Bellingham, Wash., for defendants.

NETERER, District Judge.

The plaintiff seeks cancellation of two policies of life insurance obtained, it is alleged, fraudulently. Incontestable privilege is limited, no adequate remedy at law is therefore available, and equity must consider the involved issue. Jeffress et al. v. New York Life Insurance Co. (C.C.A.) 74 F.(2d) 874-877; Jefferson Standard Life Insurance Co. v. Keeton (Equitable Life Assurance Society of the United State v. Keeton) (C.C.A.) 292 F. 53; Jones et al. v. Reliance Life Insurance Co. of Pittsburgh, Pa. (C.C.A.) 11 F.(2d) 69; Brown et al. v. Pacific Mutual Life Insurance Company (C.C.A.) 62 F.(2d) 711, 712; Shaner v. West Coast Life Insurance Co. (C.C.A.) 73 F.(2d) 681.

Plaintiff charges that defendant in February, 1921, had an attack of sleeping sickness and consulted a physician, and in said year suffered a partial stroke of paralysis and consulted a doctor, and suffered permanent residual impairment, and control of one arm and one leg, and in his application for insurance on inquiry had denied such condition and conduct.

The testimony establishes that prior to February, 1921, defendant was strong, virile, and healthy athlete, was active in basket ball and other athletic activities in the Y. M. C. A.; that he hiked in the mountains over long trips between 1921 and 1932, and fished along mountain streams. In January, 1921, defendant had Influenza and was attended by a physician. February, 1921, on one of his hikes defendant slipped and fell down a rocky declivity some 12 or 15 feet, injuring his right knee and shoulder, and fractured some small bones in his right hand. He carried this hand in front of his body in a sling, suspended from his neck, for several weeks. He was working in the county assessor's office. He was a good penman and wrote by free-arm movement, and after this injury he wrote by holding his right wrist with his left hand.

June 11, 1921, defendant went to Vancouver, B. C., with his mother who, he says, had sleeping sickness, to consult a specialist. The doctor, however, does not remember the mother, but remembers diagnosing defendant's illness as sleeping sickness. Defendant says the mother's illness was diagnosed, and challenged attention to the daily memorandum of the doctor that "F. M." and "J. N." Carver are noted and the examination was in fact the mother, and that only the defendant's shoulder was examined after the mother's diagnosis was made, and in this has corroboration by his brother, physical director in the Bellingham State Normal School. Defendant's sister also testified that the mother did go with the defendant and her brother to Vancouver, B. C., and that her right foot was impaired, and when her right leg was crossed over the left knee, the right foot was "shaky," and she carried her right hand in front of her body, and that the hand trembled and was "shaky." The letters "J. N." are on the statement. These are the mother's initials and there is a line drawn across them showing, no doubt, that "J. N." was first written and the letters crossed out and "F. M.," defendant's initials, written instead.

Defendant continued to work following injury in February after a short interval, and was somewhat active in athletics, refereed several foot ball games, took hikes in the hills every autumn, carrying heavy packs each time, and during all of the time had a limp in his right leg and in walking dragged his right foot to some degree. This was not so noticeable after 1925, and "a stranger might not notice it."

He swung and carried his arm somewhat in the relation of a diagonal swing at an acute angle in front of the body, and obtuse angle to the back, instead of swinging directly for'd and aft; his right arm somewhat flexed at the elbow.

In 1932–1933, he walked over mountain ranges 200 to 4,000 feet elevation, and from 2,400 feet in one day and back the next, carrying a pack. In 1933 he went to Elbow Lake 1,500 to 4,000 feet elevation, carried a 35-pound pack. Hiking was his hobby. He weighed in 1921, 150 pounds; in 1934, 155 pounds. He now weighs 145 pounds.

In 1927 and 1928 defendant was an expert operator on the Monroe Comptometer, "one of the best in the city," the Comptometer has 87 keys which are compactly set and movement of the hand must be steady so as to touch the right key. The operation requires the use of both hands. Defendant was employed by some of the leading mercantile firms in the city of Bellingham, after hours in extending and copying inventories, and they found his "work very satisfactory."

He made application to the Traveling Men's Association of Iowa for insurance in 1927, in which he stated he "had sleeping sickness in February, 1921. It began on February 14th, and he was back to work in approximately seven weeks. I am apparently fully recovered and have been doing the same work since as I was doing before being sick."

He also made application for insurance in another company, Paul Rocky, agent for the insurance company in 1927, in which he made practically the same statement as to sleeping sickness.

In the application in issue, he said:

"Q. Are you in good health? A. Yes.

"Q. Have you suffered from any ailment or disease * * * of the lungs, brain, or nervous system? A. No.

"Q. Have you ever consulted a physician or practitioner for any disease or ailment not mentioned in your above answers? A. No."

At the foot thereof appears the following: "I hereby declare that all the statements and answers to the above questions are complete and true, and I agree

that they shall form a part of any policy contract that may be issued on the strength thereof, and I expressly waive on behalf of myself and of any person who shall have or claim any interest in any policy or contract issued hereunder all provisions of law forbidding any physician or other person who has attended or examined me, or who may hereafter attend or examine me, from disclosing any knowledge or information which he thereby acquired, or may hereafter acquire."

In the second application of March 2, 1934, defendant made statements as follows: "I have never made application for life, accident or health insurance which was declined, postponed, or modified as to the amount planned or premium (any exception must be stated in full) A. No exception."

2A: "Has your application for life, health or accident insurance ever been rejected, postponed, rated up or rejected?" (if yes, state names and dates) "No."

4A: "Have you ever suffered any injury or disease? (if yes, state full details below) "No."

4B: "Have you ever consulted a physician or practitioner for any disease or ailment not mentioned in your above answers? (if yes, state full details below) "No."

"I have never made an application for Life, Accident, or Health Insurance which was declined, postponed, or modified as to the amount, plan, or premium."

"Has your application for Life, Health, or Accident Insurance ever been rejected, postponed, rated up, or rejected?" (if yes, state each company, date, and cause) "No."

"7. Are you at this date in good health?" "Yes."

Also states, "I hereby declare that all the answers to the above questions are complete and true, and I agree that they shall be the basis for any action taken by the company upon this application," and, further:

"I hereby agree that my application on which policy No. 539181 was issued together with the declarations made therein, shall be the basis of and form a part of the contract hereby accepted, and I hereby certify that I am now in good health and have had no sickness, injury or impairment of health since the date of my examination under the original application above referred to; that there has been no change in my family history since the said examination, and furthermore, that I have made no application for life insurance that has not been granted in the exact kind and amount applied for. * * *"

In January, 1934, he made application in the plaintiff company for $10,000 which was issued. On March 21st, of the same year, he made application for additional insurance in the sum of $14,000 which he could do without re-examination for physical condition on the basis of answers in his application for the former policy and his statement that he was in good health.

Plaintiff states that he made the answers in applications to the policy in 1927 because he wished to get rid of the agents; that he did not desire insurance; and that stopped the annoyance. Paul Rocky, agent, who took one application, testified, but there is no testimony that there was any annoyance, or that he called more than once, and the agent and defendant were close, intimate friends. The other company had no soliciting agent, but the application was merely indorsed by another member who carried insurance in the company and received for such act from the company a token, a "pig skin" pouch, or something of that character.

In 1928 defendant Carver also told a Mr. Crum that he had sleeping sickness. Crum was not an insurance solicitor.

In 1930, defendant consulted his physician in Bellingham. The doctor found his right hand trembling and "shaky" and on being asked the cause the defendant said to his doctor that he had had sleeping sickness.

In the policy in issue defendant in his application denied having had any sickness or consulted any physician, and on the 19th day of March, 1934, he obtained the second policy on his answers in his application and answers for policy in January, 1934, and examination by the physician, and the $14,000 policy was issued upon the return of his $10,000 policy, instead of obtaining an increase of $14,000, he obtained an increase of $4,000. On receipt of $14,000 policy he returned it to have provision incorporated that during total disability premium payments are waived.

Defendant, after the issuance of the above policy by the plaintiff, obtained a policy in the Mutual Benefit H. & A. Association for $100 monthly benefit, and in the Massachusetts Protective Association for $200 monthly benefits, and other policies so as to receive $375 monthly benefit. Defendant says, he had an annual income in addition to the salary of approximately $2,500. The testimony shows, however, less than $1,500 in one year, $1,200 of which was an advance sale price over the purchase price of real estate. He had invested in some stocks, but there is no evidence of profit or much income of such stocks. The annual premiums on the policies issued to the defendant were approximately $1,400.

On November 14, 1934, defendant awoke in the morning and found that his right arm and right leg were partially paralyzed. He was totally impaired, and made application for payment under the *impairment* clauses of *all the policies*, in all of the companies that had issued policies to him. Each of the other companies compromised the claim made against it. The plaintiff, after making some payments, brought this action to cancel the policy on the ground of fraud, tendering and on refusal to accept same, depositing in this court all premiums paid by the defendant. After this suit was begun, the defendant went to Vancouver, B. C., and asked the nurse at the doctor's office, whom he had consulted in June, 1921, not to disclose to any one that he had consulted the physician in June, 1921. The policies would not have been issued if the interrogaries had been truly answered.

If the defendant made the challenged statements with the *actual intent to deceive,* the policies must be canceled.

The legislative policy of the state does not lightly void or cancel insurance policies. Section 7078, Rem.Rev.Stat.Wash.:

"No oral or written misrepresentation or warranty made in the negotiation of a contract or policy of insurance, by the assured or in his behalf, shall be deemed material or defeat or avoid the policy or prevent it attaching, unless such misrepresentation or warranty is made with the intent to deceive."

Remington's Revised Statutes, § 7238, a later enactment, reads as follows:

"The falsity of any statement in the application for a policy of insurance against loss or damage from the sickness, or the bodily injury or death of the insured by accident shall not bar the right to recovery thereunder unless such false statement was made with *actual intent to deceive* or unless it *materially* affected either the *acceptance* of the risk or the *hazard assumed* by the insurer." (Italics supplied)

The burden rests upon the company to show that any false statements made were with *actual intent to* deceive. Askey v. New York Life Insurance Co., 102 Wash. 27, 172 P. 887, L.R.A.1918F, 267. Where a false statement is made, however, knowing it to be false, the presumption is that it was made with the intention to deceive. Quinn v. Mutual Life Insurance Co., 91 Wash. 543, 158 P. 82. The defendant confessedly deliberately and consciously made the false statements. The statements are material, induced the plaintiff to issue the contract of insurance, assumed a hazard which without such falsity it would not have assumed. The fact that several applications for insurance had been denied when the truth was told, and after the issuance of the policy in January, 1934, upon the false statements other policies were obtained upon like false statements involving annual premiums of approximately $1,400 and monthly indemnity of $375 with the defendant's somewhat limited income, and the endeavor to suppress the evidence of *previous consultation with the consulted* physician (Dr. Thompson) in 1921, and not disclosing consultation with Dr. Smith in 1930, the conclusion appears to me inevitable that the statements were made with actual intent to deceive, Mutual Life Insurance Co. v. Campbell, 170 Wash. 485, 487, 16 P.(2d) 836; Perry v. Continental Insurance Co., 178 Wash. 24, 33 P.(2d) 661. The defendant knew that when the truth was told all insurance was denied. The plaintiff's officers testified policies would not have been issued had the truth been told. The Supreme Court of Washington in Great Northern Life Insurance Co. v. Johnson, 60 P.(2d) 109, decided August 20, 1936, said the rule of section 7078, supra, should not be extended to include an insurance contract which would not have been issued if the truth as to known facts inquired of had been told.

I think that the rule that statements in applications for life insurance of prior illness and consultation with physicians are material, **as a** matter of law

is stare decisis. Hesselberg v. Ætna Life Insurance Co. (C.C.A.) 75 F.(2d) 490; Mutual Life Insurance Co. v. Hilton-Green, 241 U.S. 613, 36 S.Ct. 676, 60 L. Ed. 1202. The issue here does not involve a temporary functional disorder or indisposition. Houston v. New York Life Insurance Co., 159 Wash. 162, 292 P. 445. It is permanent residual impairment which was known to the defendant as shown by his statements over a period of years to and covering the time of consultation with his physician in 1930, and this was known to be material as all insurance was denied when the truth was told. While insurance contracts aside of statute are uberimae fidei and voidable for suppression of truth when required to speak truly, Stipcich v. Metropolitan Life Insurance Co., 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895, the statute of Washington enters into and becomes a part of the contract, and the suppression or falsity must be made with *actual intent to deceive*. While it is psychologically impossible to enter the mind of the defendant to determine the motive prompting the false statements, all the related circumstances with the statements and conduct of the defendant preclude any conclusion other than the false statements were made with actual intent to deceive.

The foregoing may stand as the court's findings and conclusion. If either, or both parties desire fuller or more formal findings such may on notice be presented. Form of decree canceling the policies may on notice be presented.