## CALIFORNIA WESTERN STATES LIFE INS. CO. v. VAUGHN et al.

### No. 11500.

Circuit Court of Appeals, Ninth Circuit.

Jan. 5, 1948.

Kahin & Carmody, of Seattle, Wash., (Joe S. Pearson, of Seattle, Wash., of counsel), for appellants.

Cooper & Cooper and Leslie R. Cooper, all of Everett, Wash., for appellees.

Before DENMAN, STEPHENS and ORR, Circuit Judges.

STEPHENS, Circuit Judge.

This appeal is from a judgment of the district court, awarding insurance benefits to the named beneficiary of a life insurance policy.

On the 17th day of September, 1945, James Arthur Vaughn, a resident of the State of Washington, made application to The California Western States Life Insurance Company, a California corporation, for insurance upon his life.

On the day following, the applicant was given a physical examination by Dr. Cedric Tuohy, who was authorized by the company to perform such service. In the course of the examination, the doctor read certain printed questions aloud to Vaughn from a form furnished by the insurance company, and wrote Vaughn's answers in the blank spaces left in the form opposite the questions. Upon concluding the questions and the writing of the answers, Vaughn was handed the form, which he looked over and signed as correct. Whether Vaughn read it all, the doctor testified at the trial that he did not know.

Dr. Tuohy also examined Vaughn's abdomen by hand, examined the chest, heart, blood pressure, nervous system, urine, pulse and temperature, finding all normal. He endorsed the form to the effect that he found the applicant to be in good health and that he passed the applicant for insurance, and thereupon forwarded it to the company. The fact that the examining doctor "passed" the applicant does not affect the company's right to accept or reject the application.

When at the trial the doctor was asked whether or not he would have passed Vaughn had he known of Vaughn's visits to Dr. James A. Durant, hereinafter set out, he answered in the affirmative.

The money for the insurance premium was paid on the day following the signing of the application, and the case was tried upon the assumption that it was forwarded to the company with the application. The application for insurance was accepted at a later date by the company, and a policy, back-dated to August 23, 1945, was issued and forwarded to Vaughn on October 3, 1945. There is no question in the case as to its delivery.

Vaughn died on the 19th day of November, 1945, and Carolyn Vaughn, his widow and beneficiary on the policy, forwarded proof of death and demand for payment of the benefits about five days thereafter.

There is nothing in the facts to indicate that any communication passed between the beneficiary and the company after the sending of the notice and the demand, but the company did not pay any part of the benefits, and, instead, filed suit in the Western District of the United States District Court of Washington, praying that Carolyn Vaughn and the Vaughn minor children (contingent beneficiaries), by their guardian ad litem (Carolyn Vaughn), should be enjoined from bringing suit on the policy, and that the policy should be cancelled. A temporary injunction was granted by stipulation, although those who were enjoined,

later unsuccessfully petitioned for its release.

One ground alleged in support of the relief sought was that Vaughn had falsely answered material questions contained upon the form used by Dr. Tuohy, for the purpose and intent of securing the insurance applied for, and that had they been truthfully answered, the application would not have been accepted and the policy would not have been issued. Another ground alleged in support of the relief prayed was that the policy, though it was issued, never became effective. The reason for this was that there were three "conditions precedent," two of which were never met. The application, which by its terms became a part of the policy, provided that the applicant must be in "good health" when the policy was delivered, the applicant had not visited a physician, professionally, between the date of the application and the delivery of the policy, and the applicant had not changed his vocation in such interim. It is alleged that the applicant was not in good health when the policy was delivered and that he had visited, and had been treated by, a physician.

In due time the defendants named in the complaint (the direct and contingent beneficiaries) answered and cross-complained, praying that they be awarded the benefits provided in the policy, to which the plaintiff filed appropriate pleadings.

To a great extent the company relies upon the "incontestable" clause [1] of the policy for the right to maintain its suit in equity. The claim is that by its terms, the company's reasons for withholding payment could not be used as defenses to a suit for collection after the expiration of two years from and after Vaughn's death. The company conceded that judgment should go to the beneficiaries for the return of the premiums paid and deposited the proper amounts into the court's registry.

There were several amendments to the pleadings, and so far as we need consider them, the issues of applicable law and of the fact when the case eventually went to trial were: Did Vaughn falsify answers to material questions contained on the form held by Dr. Tuohy? If he did, were the answers to such questions given with intent to deceive the company in its action on the application; and if so, did they influence the company in accepting Vaughn as an insurance risk? Did the policy ever become effective?

In due time the beneficiaries requested a jury for the trial of the case, and an order to summon a jury was issued. Thereafter the company moved the court to quash the order on the ground that the case was not in law, but was in equity. The court denied the motion, and the case was tried to the court and jury.

At the conclusion of the taking of testimony, the company moved the court to direct a verdict in its favor upon the ground that the evidence shows conclusively that the policy never became effective, that Vaughn did falsify answers to material questions put to him by Dr. Tuohy from the form, that the false answers were given with intent to influence the company to pass him and issue the policy, and that they had that effect. The court denied the motion.

The court gave instructions to the jury and thereupon submitted the case to the jury, furnishing it with appropriate forms by which its general verdict could be returned. At the same time the jury was requested to answer, three interrogatories, which were thereupon submitted to them in writing. The jury returned a general verdict in favor of the insurance beneficiaries, and answered two of the three interrogatories submitted. The nature of the answer to Interrogatory No. 2 made answer to Interrogatory No. 3 unnecessary.

The interrogatories and answers were as follows:

*Interrogatory No. 1:* "Did James Alfred Vaughn, in his application, dated Sept. 18, 1945, represent to plaintiff, California Western States Life Insurance Company, with intent to deceive the plaintiff in order to procure an insurance policy on his life, that he had not been examined by a physician?" *Answer:* "No."

---

[1] "This policy shall be incontestable * * * after it shall have been in force for two years from its date of issue, if all premiums shall have been duly paid."

*Interrogatory No. 2:* "A. Did James Alfred Vaughn know that he was not in good health when he signed the application on September 18, 1945?" *Answer:* "No." "B. If your answer to (A) above is in the affirmative, did James Alfred Vaughn withhold such knowledge from the plaintiff with intent to deceive said plaintiff?" *Answer:* "_____."

After the verdict was returned the company made a "Motion for Order Setting Aside Verdict and Judgment and for Entry of Judgment in Accordance with Motion for Directed Verdict, and in the Alternative for a New Trial." This motion was denied in its entirety. The company appeals.

Appellant argues its appeal under four numbered heads. We shall treat the issues accordingly, except that the issue under the third heading will be treated lastly.

The first heading in the company's opening brief is: "I. The uncontroverted evidence of representations made by the deceased discloses that they were false—so much so that an intent to deceive appellant in order to procure a policy of insurance is established as a matter of law."

The judge concluded, as he stated in his instructions to the jury, that the issues were:

"1. Were the answers to the questions false, and, if so, were they knowingly made by Vaughn with the intent to deceive the plaintiff and secure from plaintiff the policy of insurance subsequently issued?

"2. Was Vaughn in good health, as far as he knew and believed, at the time he paid the first premium and the policy purported to become effective under its terms?"

It would appear from a perusal of the instructions given the jury that the issue numbered "2," insofar as it was submitted to the jury for its consideration, as to its general verdict, and as to its answer to the interrogatories, was confined to Vaughn's "knowledge and belief," and not to the fact as to whether or not he was actually in good health when the insurance risk was accepted or as to the date to which the policy was back-dated. No issue pertaining to Vaughn's consulting or to his treatment by a physician after his application or after the policy date was ever submitted to the jury. The sig-

nificance of this comment will more clearly appear from reading our treatment of appellant's opening brief headings II and III.

So far as relevant to the issues, the questions propounded to Vaughn, and the answers he gave to them, were as follows:

"16. What illness, diseases, accidents or operations have you ever had and for what conditions have you consulted a physician? Describe fully.

"Illness or Injury * * *
    "never sick

"17. Are you now in good health, as far as you know and believe?

"Yes

"18. For what conditions have you consulted a physician or other practitioner within five years?

"None

"19. Have you ever had, or been advised to have, any surgical operation?

"No."

Although the truthfulness of Question No. 25 is not attacked, we quote it with the answers given:

"25. Family Record: In giving cause of death or ill health, avoid indefinite terms. * * *" The answer stated that Vaughn's wife, age 35, his father, age 85, his mother, age 77, his brothers, ages 35 and 47, and his sisters, ages 39, 41, 43, 45, 49 and 57, were all alive and in good health.

Vaughn had lived in the small city of Snohomish, State of Washington, for many years where he enjoyed a good reputation. He was of a sturdy build, and had gone for years without losing a work day as a draftsman, and those associated closely with him had never heard him complain of any pain or ill health. Almost up to the day he was taken to the hospital and was operated upon (September 28, 1945), he helped after work hours at the clearing of land for his gun club, and devoted his whole week of vacation, which began July 4, 1945, to that enterprise. He was fond of bowling and indulged in that sport.

About April 1, 1945, Vaughn called upon Dr. Durant, who testified at the trial that Vaughn complained of "a certain amount of distress in his abdomen" in the right

side, and that he advised Vaughn that "he had a mild attack of appendicitis," and "I told him the only cure, so far as cure was concerned, was to have it removed. * * * he didn't want anything to be done, it didn't bother him that much, and I told him to be careful not to eat rough stuff; to take mineral oil if he took a laxative."

Vaughn's wife testified that shortly before this visit to Dr. Durant's, she "knew he didn't feel well * * * he just said it [his stomach] was a little tender," and she urged him to see the doctor. Upon returning from the visit, he told her, "Oh, it was nothing serious." Mrs. Vaughn also testified that her husband was a light eater, preferring vegetables, and did not change his eating habits after visiting the doctor, that he was a sound sleeper, never had been sick, and never before had complained.

About May 22nd Vaughn called upon the doctor again, and this time, as the doctor testified, "It was just about a recital of the same thing. He [Vaughn] had a certain amount of tenderness on deep pressure, but not very much. * * * I told him about the same thing."

Again, about September 10th, Vaughn visited the doctor. The condition, so the doctor testified, was "Just about the same. * * * I didn't say very much to him other than it [Vaughn's complaint] wouldn't bother him any more than it had heretofore, and if anything happened to let me know."

Vaughn called at the doctor's office again September 18th in "apparently the same condition." At this meeting, Vaughn inquired of the doctor his opinion as to whether or not he would be able to get insurance. The doctor, while on the witness stand, was not allowed to state his answer. It is appropriate to state that both Dr. Durant and Dr. Tuohy were examiners for the insurance company, and that there is no direct evidence as to why Dr. Tuohy was chosen to make Vaughn's physical examination.

On September 25th Dr. Durant was called to his patient's home and found that Vaughn was having more trouble in his side, with some temperature and tenderness. Mrs. Vaughn testified that her husband came from his day's work that evening and didn't eat. He had never missed a meal before,

and, as she put it, "* * * that is the first I knew that he didn't feel well."

The doctor called to see Vaughn twice the next day, and sent him to the hospital on the following day with a diagnosis of appendicitis. Dr. Durant, with assistance, operated the next day, and a duodenal carcinoma, with appendix involved, was revealed.

Vaughn was discharged from the hospital October 14th, returned November 14th, and died November 19th from the ravages of the carcinoma.

There was creditable, though not conclusive, evidence on behalf of the company to the effect that the duodenal carcinoma, discovered through the operation, was present in Vaughn's body prior to the date of the application and prior to the back-date of the policy, and, also, to the effect that the questions propounded to Vaughn by Dr. Tuohy, which are alleged to have been falsely answered, were material, and that the company would not have accepted the insurance risk had they been truthfully answered.

Mrs. Vaughn testified that the insurance agent, Mr. Hubbard, called upon her and her mother the evening of the day after her husband's death, and that "He said that he tried before [to sell insurance to Mr. Vaughn] and Alf [Mr. Vaughn] never seemed interested; in fact, he wasn't interested this time, but he said he took an hour and a half or two hours and convinced him that he needed it for our protection," and that "Mr. Vaughn stated to Mr. Hubbard that he was getting a raise in a month or so, and he would rather wait until then, when he could more afford it." There is further evidence of Hubbard's making similar statements to another person.

Upon the subject of selling the insurance to Vaughn, the evidence reveals that Hubbard, the insurance agent, had sold Vaughn some insurance years ago, and that he had continued through the years to try to sell him a life policy. Hubbard, on the witness stand, was asked, "Did you have some difficulty in persuading him to purchase the policy?" to which he replied, "No, not particularly. I don't think so. It was just a matter * * * [interruption]. It was

more a matter of explanation rather than convincing the man that he wanted it. I think he agreed that he would buy some, but it was the time it takes for the description of the policy." Later, he testified that the sale was a "push over."

The policy was ordered before Hubbard left that evening while Mrs. Vaughn was out, and down payment was made in money the next day.

We must consider whether or not the answers to the questions on the form held by Dr. Tuohy or any of them were as a matter of law false and intentionally false.

The application as signed, of course, does not reflect the strict truth about Vaughn's having consulted a doctor. It is conceivable, however, that when Dr. Tuohy read the question to him, he thought it was an inquiry as to conditions for which he had been treated.

As to whether or not he had been advised to have a surgical operation, there is a good deal to be said. The consulting physician told Vaughn the only way to cure the trouble was to have the appendix out. He told him, however, to eat no or little roughage and take mineral oil if laxative were needed, and he would get along all right. There is no testimony that the doctor treated or prescribed medically for Vaughn beyond suggesting diet and the proper laxative.

There certainly was no outright diagnosis that the appendix was in such a condition that it must be taken out. Rather, the testimony of the doctor as to his conversation with Vaughn confirms the statement attributed to Vaughn by his wife after the first visit to the doctor, "Oh, it is nothing serious."

In the circumstances, including Vaughn's long period without illness, and his physical strength, and his knowledge of his family's remarkable history for good health and survivorship, together with the showing under Dr. Tuohy's examination, it appears to us, as it did to the trial judge, that fraud within the statute involved need not, necessarily, be drawn from the evidence.

There are two Washington statutes which may be noticed at this juncture, one of which, Rem.Rev.Stat. Sec. 7078, in part constitutes a recognition of the likelihood that inaccuracies, even untruths, may appear in the application, and provides that such " * * * shall [not] be deemed material or defeat or avoid the policy or prevent it attaching, unless such misrepresentation or warranty is made with the intent to deceive." [2] The other statute, in general, covers the requirement of good faith in insurance contracts.[3]

Appellee relies upon the case of Houston v. New York Life Ins. Co., 159 Wash. 162, 292 P. 445; 166 Wash. 611, 8 P.2d 434, for support of the judgment. A fair digest of the facts is shown in the Pacific Reporter's headnote, number 5, as follows:

"Whether applicant omitted information regarding consultation with physician who advised appendicitis operation with intent to deceive *held* for jury (Rem.Comp.Stat. § 7078).

"Evidence showed that applicant omitted to inform insurer, in answer to question

[2] Rem.Rev.Statutes of Washington, § 7078, provides: "No oral or written misrepresentation or warranty made in the negotiation of a contract or policy of insurance, by the assured or in his behalf, shall be deemed material or defeat or avoid the policy or prevent it attaching, unless such misrepresentation or warranty is made with the intent to deceive. If any breach of a warranty or condition in any contract or policy of insurance shall occur prior to a loss under such policy, such breach shall not avoid the policy nor avail the insurer to avoid liability, unless such breach shall exist at the time of such loss under such contract or policy."

[3] Rem.Rev.Statutes of Washington, § 7032, provides: "Within the intent of this act the business of apportioning and distributing losses arising from specified causes among all those who apply and are accepted to receive the benefits of such service, is public in character and requires that all those having to do with it shall at all times be actuated by good faith in everything pertaining thereto; shall abstain from deceptive or misleading practices, and shall keep, observe, and practice the principles of law and equity in all matters pertaining to such business. Upon the insurer, the insured, and their representatives shall rest the burden of maintaining proper practices in said business."

whether he had consulted physician within 24 months, of a consultation with a physician regarding a soreness of about 10 days' duration in the right lower quadrant of the abdomen, not preceded by any previous attacks, and that physician diagnosed a mild acute attack of appendicitis, and advised an operation; that applicant did nothing further concerning any appendicitis affliction he may then have had until after insurer had reinstated the policy, when a successful appendicitis operation was performed, and that applicant died one year subsequent to the operation, of a disease of the heart."

In the cited case the Supreme Court of Washington went thoroughly into the point under consideration, and we think on principle it is authority for the trial court's ruling in the instant case that the evidence presented an issue of fact as to whether or not Vaughn made the misrepresentations with intent to deceive and thereby to secure favorable action upon his application for insurance.

Since the Houston case, supra, the Washington Supreme Court has spoken plainly on the issue in two cases, namely, Kay v. Occidental Life Ins. Co., 1947 Wash., 183 P.2d 181, and Breshears v. United Ben. Life Ins. Co., 1947 Wash., 183 P.2d 1015.

The Kay case, supra, was one in which the trial court dismissed the action, which had been brought to collect life insurance, upon the ground that the evidence was not sufficient to sustain a judgment for the plaintiff. The facts were strikingly like the instant case, though there are, of course, some differences. We think, however, they are differences arguable to the trier of facts and not as to principle. In the Kay case, the first question was as to the applicant's ever having had ulcer of the stomach or bowels. He had had duodenal ulcer, and knew it, though he answered, "No." The fourth question was as to his having had any illness or disease not listed on the form being used. He answered in the negative. It was asked by question two, whether or not he had consulted any physician or practitioner not named in the application. He answered, "No." He had, however, consulted three physicians in connection with the ulcer and had not named them. Question three was [183 P.2d 184], "Have you ever undergone any special tests or treatments, such as * * * X-ray?" and the answer was, "Not that is sure of." The applicant had consulted a physician, stating that he had been treated the preceding year for ulcer of the duodenum but was now complaining of pain in the upper ipigastrum. The doctor took X-rays and advised that the ulcer was completely healed, "but told him that he did not feel his condition would remain satisfactory unless he would stay on a diet." The diagnosis then was "pyloric spasm." Sometime later Kay was admitted to a sanitarium with suspected tuberculosis. He was discharged, but later was hospitalized, and died shortly thereafter. The Supreme Court of Washington reversed the judgment upon the ground that the question of intent to deceive should have been submitted to the jury.

The Breshears case, supra, was along the same line, and we refer to the facts very briefly. The applicant for insurance, like the applicant in the case in suit, was strong, robust, with a good reputation for "truth and veracity," and had never missed a day's work until his last sickness. His wife testified he had never been seriously ill since their marriage. About four months before applying for insurance he consulted a physician February 9, 1945, for a cold and pain in the chest, and he was unable to work. A thorough examination was given the patient, although no X-ray or fluoroscopic examination was made. His blood pressure was extremely high. The patient received treatment. The patient returned to the doctor February 12, 1945, with the same complaint, and he was treated with a narcotic to relieve the pain. They discussed the illness together. In answer to the following question put to the doctor, "Had you said enough to him to impress him with the idea of the seriousness of his blood pressure?" the doctor replied, "Mr. Breshears didn't impress me as the type of person who would worry a great deal about anything—I can't answer that—that is, I can't say that we had any lengthy discussion about the thing."

In his physical examination, the applicant was asked certain questions, which, together with the answers given by the applicant, are as follows:

"Q. Have you had * * * tuberculosis or any respiratory disease? A. No."

"Q. Name below all causes for which you have consulted a physician in the last ten years. A. None."

"Q. Are you now in good health? A. Yes."

The applicant had a tooth pulled October, 1945, and an acute phase of chronic nephritis developed from which he died later that month.

Although, as is stated in the opinion, 183 P.2d at page 1018, "It is quite apparent that the answers to the above-mentioned questions were false," the Supreme Court approved the trial court's submission of the case to the jury upon the issue of "whether the insured had an intent to deceive when he falsely answered the questions." The jury's verdict negatived this issue, finding for the beneficiary of the policy.

See also Great Northern Life Ins. Co. v. Johnson, 187 Wash. 347, 60 P.2d 109; Miller v. United Pacific Casualty Ins. Co., 187 Wash. 629, 60 P.2d 714.

■ In our consideration of the points raised on appeal in this case, we realize that clear and convincing evidence of material misrepresentation, standing alone and without modifying circumstances, would not properly be given the jury, for, as the court said in the Kay case, supra, 183 P.2d at page 182, " * * * there is a presumption that it was made with intent to deceive." Quinn v. Mutual Life Ins. Co., 91 Wash. 543, 158 P. 82; Day v. St. Paul Fire & Marine Co., 111 Wash. 49, 189 P. 95; Equitable Life Ins. Co. v. Carver, D.C., 17 F. Supp. 23. We have also considered that "Under the Washington law a presumption is not evidence and does not shift the burden of proof, but merely shifts to the party against which it exists the duty of going forward with the evidence." Equitable Life Assur. Society v. MacDonald, 9 Cir., 96 F.2d 437, at page 439. See citations therein.

It is obvious that where the applicant who made the alleged misrepresentations is deceased, direct evidence in the matter of going forward with proof of his lack of intention to deceive is unobtainable. Proof thereof must be shown, if at all, through circumstances. Such circumstances were found in the Kay and Breshears cases, supra, and the jury in the instant case was allowed to consider all circumstances relevant to that issue. This issue was left to the jury because the court thought the circumstances, when analyzed, left such a doubt as to the falsity and as to Vaughn's intent in answering the form questions as he did, as to require that the questions be submitted to the triers of fact.

For a full discussion of the issue under consideration, see Prudential Ins. Co. of America v. Winn, 9 Cir., 71 F.2d 126.

We have carefully reviewed cases cited by appellant, and have, ourselves, followed the issue beyond the briefs. There is contra authority in jurisdictions other than the State of Washington. There are Washington cases, cited below, from which it may be argued that the conclusions reached by the trial court and by us as to the instant case are wrong. We think, however, that the cases do not differ in principle, but that they do differ in fact. See McCann v. Reeder, 178 Wash. 126, 34 P.2d 461; Perry v. Continental Ins. Co., 178 Wash. 24, 33 P.2d 661; Paulson v. Montana Life Ins. Co., 181 Wash. 526, 43 P.2d 971; Day v. St. Paul Fire & Marine Ins. Co., 111 Wash. 49, 189 P. 95.

We conclude that the court was right in holding that the questions of falsity and of intent were questions of fact for the trier of fact.

The second heading in the company's opening brief is: "II. The existence of good health on Vaughn's part on and after August 23, 1945, was under the provisions of the policy a condition precedent to a binding contract."

The application was made September 17, 1945. The Premium was paid and the physical examination was made September 18, 1945. The policy was issued, backdated, as of August 23, 1945. The application contained the provision that when a

policy should issue, the application, as signed by the applicant, becomes a part of the policy, or, in other words, a part of the contract of insurance. The application contained inter alia the following notation: "It is mutually agreed as follows: 1. That the insurance hereby applied for *shall not take effect unless and until the policy is manually delivered* to and received by the applicant in person and *the first premium thereon paid in full during his lifetime and good health,* and then *only if the applicant has not consulted or been treated by any physician,* or changed his occupation, *since his medical or non-medical examination; provided, however,* that if the applicant, at the time of making this application, pays the agent in actual cash the full amount of the first premium for the insurance applied for in Questions 7, 8, 9 and 10, and so declares in this application and receives from the agent a receipt therefor on the receipt form which is attached hereto, and if the Company, after its usual examination and investigation, shall be satisfied that the applicant was, at the time of completion of this application, insurable and entitled under the Company's rules and standards to the insurance, on the plan with the Additional Benefits and with the Accident and Health Insurance and for the amounts applied for in Questions 7, 8, 9 and 10 at the Company's published premium rate corresponding to the applicant's age, *then said insurance shall take effect and be in force, under and subject to the provisions of the policies applied for, from and after the date of medical examination,* or of the nonmedical examination therefor, in accordance with the rules of the Company, *whether the policies be delivered to and received by the applicant or not.*"

We understand this notation to point out that the insurance is not effective before delivery of the policy to the applicant. And when delivered, it is effective only provided the first premium has been paid, and the applicant is then in good health. Further, the delivery of the policy in those circumstances does not bring the contract of insurance into effect if, since the physical examination, the applicant for insurance has been treated by or has consulted a physician or has changed his occupation since the date of his application and examination. The reference to change of occupation need not be noticed as no change of occupation is claimed.

The admitted facts show clearly that in such interim Vaughn had consulted a physician and had been treated by a physician. Furthermore, there is strong evidence that Vaughn was not in good health during the period mentioned.

However, there is a proviso to the notation which we have mentioned as being on the application. The beneficiaries view the proviso in the notation as one practically independent of that part just analyzed, and argue that by its terms if the policy premium has been paid with the application and the company is satisfied with the insurability of the applicant, the insurance contract is complete. That is, all of the other requirements for effective insurance as contained in the main part of the notation are cancelled. The trial court took the same view. We do not view the proviso in that extensive light.

We think the proviso is not of itself a complete and distinct condition or term of the policy, but that it is directly related to the affirmative statement to which it is a "proviso." It does no more than to eliminate the requirement of delivery to make the insurance effective as of the date of the application in case the risk is acceptable and the premium paid. It does not purport to waive the conditions as to good health, consultations with physicians and change of vocation, none of which would, with certainty, be revealed by the application and the examination report. Life is uncertain, and when the applicant desires to protect his loved ones or to provide for a contingency and pays his money therefor for insurance, he very naturally wants the protection to begin as early as possible. The insurance company strives to meet this desire. Approval of risks requires time and the proviso is written into the contract so that if the applicant proves to be insurable, and he has paid his money, his insurance is effective without delay.

It is suggested that the above construction makes life insurance uncertain, for one may be suffering from a lingering malady, wholly undiscovered by himself or by anyone else, hence not in good health. This

may be true, but as we see it, this fact is due to the limitation of the contract. The danger is more apparent than real, however, because the insurance company must bear the burden of showing the facts which would defeat collection of the benefits, and because the danger does not extend for more than two years, since the policy by its terms is incontestable after such period.

We are of the opinion, and hold, that on the face of the contract, existence of good health at the time the policy was delivered or under the notation proviso, effective in the circumstances of this case at the back-dated time of the policy, was a condition precedent to the effectiveness of the insurance contract. Closely related to this condition precedent is the further one that the applicant "has not consulted or been treated by any physician * * * since his medical or non-medical examination * * *." This interpretation was adhered to by appellant throughout the trial, and appellant proffered forms of appropriate instructions covering each of these conditions precedent to the effectiveness of the contract. It was re-asserted by appellant when interrogatives were being considered by court and counsel, appellant contending that interrogative No. 2 should refer to the actual good health of the applicant, rather than the applicant's knowledge and belief on the subject, and offered instruction in accord with this view.

■ There is strong testimony to the effect that the existence of the carcinoma and its effect upon Vaughn's health antedated both the back date of the policy and the application. The court, however, declined to instruct in conformity with appellant's view as above set out and did not submit the question to the jury of whether or not either of the conditions precedent had been met. Instead, the court instructed the jury that the crucial issue was whether or not Vaughn had knowledge or entertained a belief as to his health, and if so, to state his conclusions.

The evidence is all one way that Vaughn did consult a physician and was treated by a physician subsequent to his examination by the company physician and prior to the issuance of the policy. But appellants do not argue in this appeal for reversal upon the ground that this condition precedent was never met nor that the tendered instruction relating thereto was not given. We, therefore, make no ruling thereon.

We do hold, however, that the contract upon its face provides that it could never "attach" or become effective except through the incontestable clause unless the subject of insurance was in good health at the time the first premium was paid in full. The issue of good health as above indicated should, therefore, have been given the jury. The error was called to the attention of the court by objection, argument and proposed instruction. It is upon a crucial element of the case, and is fatal to any legal status of the judgment.

■ It appears to us from a reading of the record and appellees' brief, together with the instructions, that the effect of Vaughn's answers on the questionnaire as to his health and as to his having consulted a physician has not been kept separate and distinct from the "conditions precedent" based upon these subjects found in the notation on the application. Of course, Vaughn's belief and his knowledge on all matters pertaining to his health were material and were properly admitted upon the issue of falsity and intent in the answers written in the questionnaire, and it was proper to give such issue to the jury, but such issue is entirely distinct from the issue of actual good health as a condition precedent to the effectiveness of the insurance contract.

See the following cases: Logan v. New York Life Ins. Co., 107 Wash. 253, 181 P. 906; Guarascio v. Prudential Ins. Co., 110 Wash. 1, 187 P. 405.

The fourth heading in appellant's opening brief is as follows: "IV. The District Court erred in giving appellees proposed Instruction No. 10."

Instruction No. 10, in part, is as follows: "Unless you are *convinced* by the preponderance of the evidence that James Alfred Vaughn, in his application for the insurance hereinabove referred to, made false statements in answer to questions submitted to him, and that such statements were material to the risk assumed by the plaintiff and that such statements were made by the in-

sured with the intent to deceive and defraud the plaintiff, California Western States Life Insurance Company, and that the insurance company was deceived by the statements of the insured, then your verdict must be for the defendants, the beneficiaries, and against the plaintiff, the insurance company." (Emphasis ours.)

Appellant claims that even if this court should hold that the jury had evidence before it which could support its general verdict, the verdict should be set aside because the court instructed the jury that the issue of fraud could not be resolved against Vaughn unless the jury was " * * * *convinced* by the preponderance of the evidence [our emphasis]" that in falsely answering the questions in his application, Vaughn intended to and did deceive the insurance company. The point being that the court, instead of using the word "convinced," should have adhered to the usual language of "unless you believe"; and that the instruction, as given, put upon the appellant "an undue burden."

■ Instructions to the jury need not follow any particular phraseology as a rite. If the meaning is clear, the requirement has been satisfied. Fraud cannot be found except upon clear and convincing evidence, and certainly the language used by the court cannot be tortured into meaning more than that. The instruction, though, is much too broad, since it completely omits the issue arising from the "condition precedent" of good health as required by the notation on the application.

■ The third heading in appellant's opening brief is as follows: "III. Appellant's second amended complaint and appellee's second amended answer tendered equitable issues—sought equitable relief. These issues should have been first disposed of by the court."

As we have seen, the case went to trial before a jury over the objection of the insurance company. It claimed that the action was equitable and not triable to a jury. The complaint admittedly sounds in equity. The main ground upon which the insurance company brought an equitable action to cancel the policy was the claim that there were false, material statements

made in Vaughn's application, and that he was not in good health when the policy was issued and delivered.

Whether the trial court was right in ordering the plaintiff in the complaint to proceed to try the issues, which were presented by all the pleadings, to a jury as in a law case, as apparently it did do, is as the court itself appreciated, a serious question. The fact that the Washington courts, where the beneficiaries had sued in law for insurance benefits, had submitted the issues to juries, cannot be authority for the procedure followed in the federal trial court. If it may be considered that the issues in essence presented the simple case of the beneficiaries suing at law for the insurance benefits with the company defending under the issues presented in the equity complaint, then the question arises as to why the company assumed the burden of going forward from the start. Probably the answer is that the company, being the plaintiff in the case, continued to assume that it was putting on its case in equity, but that it reserved its objection to the case being tried to a jury. At any rate appellant raised, and here raises, no issue, on the score that it should not have been given the laboring oar.

We think it clear that the equities alleged in the company's complaint are not of commanding strength after the issues have been fully presented in the pleadings of both the beneficiaries and the company. Looking through them, nothing is seen which an ordinary suit at law for collection of the insurance benefits would not cover. The danger to the company under the incontestable clause of the policy had been practically eliminated. It appears that the court applied the old rule that equity is the handmaiden of the law, and held the handmaiden in check because there were no exigencies which called for her help. See American Ins. Co. v. Stewart, 300 U.S. 203, 57 S.Ct. 377, 81 L.Ed. 605, 111 A.L.R. 1268. We think the trial of the issues at law, rather than the trial of the issues in the classical equity manner, did not prejudice any right of the company.

Under the heading of "Conclusions Fourth" in appellant's opening brief, we find the following: "Fourth: The court, in its instructions, by placing an undue bur-

den on appellant with regard to proving intent to deceive, committed error for which at the very least appellant should be granted a new trial."

This is appellant's only objection touching any claimed undue burden. No argument is added.

It appears from the record that possibly one of the instruction to which this objection is raised is the one treated under heading No. IV herein, in which the clause, "Unless you are convinced by the preponderance of the evidence * * *," is used. We have covered the matter raised by the use of this clause. The further objection was argued to the court that the instruction is wrong because the proof showed clearly that there was "no question to go to the jury." We have covered that matter under heading No. III. We find no other exception or objection to the instructions on the subject. We have discovered no orror under this "Conclusion Fourth."

As has been seen, the judgment must be reversed. If the case is to be retried, nothing said in this opinion shall limit the trial court to the use of its own discretion in prescribing what it regards as proper procedure in the trial of the issues raised by the pleadings.

Reversed and remanded.